UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLINTON BALLER and
DAVID BLOOM,

      Plaintiffs,

v.

CITY OF BIRMINGHAM,
a municipal corporation,
PATTY BORDMAN,
individually and in her
official capacity as Birmingham
Mayor, and TIMOTHY
CURRIER, individually and
in his official capacity as
Birmingham City Attorney,

      Defendants.

_____/

No. 19-12138

Hon. Victoria A. Roberts

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

Now come the Plaintiffs, by and through counsel, and, for the reasons outlined
in the accompanying brief, hereby move this Court under Civil Rule 65 to enter a
temporary restraining order and/or preliminary injunction barring Defendants from
restricting political speech or advocacy by public-comment speakers at
Birmingham City Commission meetings upon the basis of its content or excluding
public comments involving political speech or advocacy from the cable broadcast

1

of City Commission meetings.

Pursuant Local Rule 7.1(a), Plaintiffs' counsel e-mailed the Defendant parties describing the nature and basis of the motion and inquiring as to Defendants' concurrence thereto, but has not yet received a response.

Respectfully submitted,

*s/Matthew S. Erard*
Matthew S. Erard
Law Office of
Matthew S. Erard, PLLC
Counsel for Plaintiffs
400 Bagley St. #939
Detroit, MI 48226
(248) 765-1605
mserard@gmail.com

Dated: August 4, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLINTON BALLER and
DAVID BLOOM,

     Plaintiffs,

v.

CITY OF BIRMINGHAM,
a municipal corporation,
PATTY BORDMAN,
individually and in her
official capacity as Birmingham
Mayor, and TIMOTHY
CURRIER, individually and
in his official capacity as
Birmingham City Attorney,

     Defendants.
_____/

No. 19-12138

Hon. Victoria A. Roberts

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY
<u>RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES……………………………………………………iii

CONCISE STATEMENT OF THE ISSUES PRESENTED……………………...vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY
FOR THE RELIEF SOUGHT………………………………………………......vii

INTRODUCTION………………………………………………………………1

STATEMENT OF FACTS…………………………………………………………1

STANDARD OF REVIEW………………………………………………………...7

ARGUMENT………………………………………………………..……………..7

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS……………....7

A. The Speech at Issue is Core First Amendment Protected Expression…………..8

B. The Venue and Broadcast of Birmingham City Commission
Meetings Comprise a Designated and/or Limited Public Forum…………………9

1.  The public forum extends to the cable broadcast……………………………...11

C. No Compelling or Legitimate Interest Supports Defendants'
Censorship of Citizens' Political Speech at City Commission Meetings…………12

1.  Excluding speakers engaged in political advocacy from the cable
    broadcast will severely limit expression………………………………………14

2.  Defendants' policy of restricting political speech is void for vagueness……...15

3.  Defendants' policy of restricting political speech is overbroad………………/17

II. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF
DEFENDANTS ARE NOT IMMEDIATELY ENJOINED FROM
ENFORCING THE POLICY OF RESTRICTING POLITICAL SPEECH……...18

i

III. NO HARM TO OTHERS IS APPLICABLE…………………………………18

IV. GRANTING IMMEDIATE INJUNCTIVE RELIEF WILL ADVANCE
THE PUBLIC INTEREST………………………………………………………..19

V. NO SECURITY BOND IS NECESSARY…………………………………19

REQUEST FOR RELIEF…………………………………………………...20

# INDEX OF AUTHORITIES

**Cases**

*ACLU v. Nat'l Sec. Agency*, 493 F.3d 644 (6th Cir. 2007)………………..……...8

*ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438 (6th Cir. 2003)………..………18

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998)…………….11-12

*Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008)………………………………10

*Bays v. City of Fairborn*, 668 F.3d 814 (6th Cir. 2012) ………..………...18, 19

*Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015)………………..8

*Boddie v. Am. Broad. Co.*, 881 F.2d 267 (6th Cir. 1989)………………………15

*Boos v. Barry*, 485 U.S. 312 (1988)………………………..…………12, 13

*Buckley v. Valeo*, 424 U.S. 1 (1976)……………………………………………8-9

*Burson v. Freeman*, 504 U.S. 191 (1992)………………………………..vii, 12-13

*Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530 (1980)…………...….13

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)  …………………………………………………...8, 11, 12

*Elrod v. Burns*, 427 U.S. 347 (1976)………………………………………….18

*King Enter. v. Thomas Twp.*, 215 F. Supp. 2d 891 (E.D. Mich. 2002)………….15

*Kinkaid v. Gibson*, 236 F.3d 342 (6th Cir. 2001)…………………………10, 11

*Kirkland v. Luken*, 536 F. Supp. 2d 857 (S.D. Ohio 2008)………………...10

*Libertarian Party of Ohio v. Husted*, 751 F.3d 403 (6th Cir. 2014)………………7

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)……………………8-9

*Michigan State AFL-CIO v. Schuette*, 847 F.3d 800 (6th Cir. 2017)……………....7

*Miller v. Cincinnati*, 622 F.3d 524 (6th Cir. 2010)………………….....vii, .9, 10, 15

*Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171 (6th Cir. 1995)………….19

*Monaghan v. Sebelius*, 916 F. Supp. 2d 802 (E.D. Mich. 2012)…………………..7

*Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008)………………………………..14

*New York Times v. Sullivan*, 376 U.S. 254 (1964)………………………………...8

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)………..10

*Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834  (6th Cir. 2000)…………....11

*Reed v. Town of Gilbert*, 576 U.S. __, 135 S. Ct. 2218 (2015)…………………...13

*Ritchie v. Coldwater Cmty. Sch.*,  947 F. Supp. 2d 791 (W.D. Mich. 2013)……...11

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)……10, 11

*Shelley v. Kraemer*, 334 U.S. 1 (1948)……………………………………………14

*Specialty Holds II Inc. v. Children's Legal Services PLLC*,
634 F. Supp. 2d 833 (E.D. Mich. 2009)…………………………………………..19

*Taylor v. Johnson*, No. 5:16-cv-10256 (E.D. Mich. April 28, 2016)………………5

*Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, No. 1:12-cv-355
(S.D. Ohio Jan. 11, 2013)…………………………………………………………11

*United Food & Commercial Workers Union (UFCW) v. Sw. Ohio Reg'l
Transit Auth.,* 163 F.3d 341 (6th Cir. 1998)………………………………..16, 17

*Walker v. Sons of Confederate Veterans*,
576 U.S. __, 135 S. Ct. 2239 (2015)………………………………………………9

**Statutes**

MICH. COMPL. LAWS § 169.257(1)(c)……………………………………..…………..5

MICH. COMPL. LAWS § 169.257(3)……………………………………………………....5

**Other Authorities**

Bloomfield Community Television, Access Policies and Procedures……..………7

Bill Laitner, *Video Reveals Fiery Exchange at Birmingham City Commission Meeting*, DETROIT FREE PRESS, July 18, 2019, https://freep.com/story/news/local/michigan/oakland/2019/07/18/birmingham-michigan-bond-sale-city-commission-meeting/1761393001...................................4

**CONCISE STATEMENT OF THE ISSUES PRESENTED**

Is a temporary restraining order and/or preliminary injunction warranted to prevent the city of Birmingham's continued facially content-based restriction of Plaintiffs' political speech at bi-weekly City Commission meetings operated as a public forum?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT

*Burson v. Freeman*, 504 U.S. 191 (1992)

*Miller v. Cincinnati*, 622 F.3d 524 (6th Cir. 2010)

## INTRODUCTION

Plaintiffs brings this motion to restrain Defendants from continuing to violate the First Amendment rights of Plaintiffs and other citizens through their policy and practice of restricting and censoring political advocacy speech by public-comment speakers within the venue and live cable broadcast of Birmingham City Commission meetings.

Because Defendants' present policy and practice constitutes a facially content-based restriction on core political speech within a public forum, unjustified by any compelling or legitimate state interest, Plaintiffs seek an immediate temporary restraining order and/or preliminary injunction to bar Defendants from continuing to subject public-comment speakers to restriction or censorship upon the basis of their speech's politically expressive character.

## STATEMENT OF FACTS

The Birmingham City Commission holds regular public meetings on the second and fourth Monday of each month in the Commission Room of the city's Municipal Building. The Commission's Rules of Procedure provide for a period at each Commission meeting, designated as 'Meeting Open To The Public For Items Not On The Printed Agenda' (i.e. the 'open-comment' session) during which members of the general public are permitted to make comments without any subject-matter limitation.

1

As to other sessions of City Commission meetings, the Commission's Rules of Procedure also provide for members of the public to provide public comment on any specific agenda items at the time the Commission considers them. The only grounds provided by the Rulecs of Procedure for ruling a recognized and time-abiding speaker out of order are becoming loud or unruly or breaching the peace.

All Birmingham City Commission meetings are broadcast live and re-run on the Birmingham Area Cable Board (BACB) municipal programming cable television channel. The broadcast is unedited and covers the entirety of each meeting.

For the last several years, Plaintiffs have regularly attended public meetings of the Birmingham City Commission in order to gather information about local spending and legislative measures and address the Commission on civic matters of priority concern to themselves and their respective citizens' groups.

In recent months, Plaintiffs and their respective citizens' groups have focused on investigating and expressing their concerns about the City Commission's proposed North Old Woodward ("NOW") development project involving the demolition and replacement of a municipal parking garage in coordination with the construction of new commercial properties on city-owned land. For the city's part in financing the project, the Commission aims to issue up to $57.4 million in municipal bonds, pending voter approval of the bond sale at a forthcoming special election.

2

Skeptical of both the city's parking revenue predictions and the public interest in turning over valuable city land, Plaintiffs fear that the proposed project, if commenced, will prove to measurably benefit only private commercial interests while carrying significant risk and cost to community residents.

On July 8, 2019, Plaintiffs both attended the regular meeting of the City Commission with the intent to raise new findings and concerns relating to the NOW project. Upon being recognized to speak during public comment on the agenda item related to city planning, Plaintiff Baller attempted to suggest that the planning committee consider citizen concerns about the NOW project.

Immediately upon raising the issue, he was interrupted and prevented from completing his comments by Defendant Currier and ruled out of order by Defendant Bordman upon the basis that the "City Attorney has directed that that is an inappropriate discussion." When Plaintiff Baller then inquired why his discussion was inappropriate, Defendant Currier asserted that he "cannot use the cable television, which the city pays for, for political purposes." As a result, Plaintiff Baller was unable to express his intended comments.

During the later open-comment session of the July 8 meeting, during which Plaintiff Bloom was recognized to speak, Plaintiff Bloom was cut off at only 25 seconds into his speaking time by Defendants Bordman and Currier immediately upon making reference to the "parking deck on Old Woodward." He was then told

3

by Defendant Currier that he was "out of order" because a provision of the contract between the city and BACB "prohibits political speech." As a result, Plaintiff Bloom was unable to express his intended comments.

As the next recognized speaker during the open-comment session of the meeting, Plaintiff Baller was similarly interrupted by interjections from Defendants Bordman and Currier on the same basis immediately upon making reference to a pro-NOW project pamphlet recently produced by the city for local residents. When Plaintiff Baller persisted in voicing objections to the Commission's actions with respect to restricting speech at the meeting and the NOW project proposal, Defendant Bordman declared the meeting adjourned.

In a Detroit Free Press interview for a story published on July 18, 2019, Defendant Currier reaffirmed that the city's contract with the Birmingham Area Cable Board "does not allow any discussion of a political nature," and further alleged that the potential conflict with freedom of speech has not been decided in a court case or state attorney general opinion.[1]

At the start of the open-comment session at the next following and most recent City Commission meeting on July 22, 2019, Defendant Bordman announced that

---

[1] Bill Laitner, *Video Reveals Fiery Exchange at Birmingham City Commission Meeting*, DETROIT FREE PRESS, July 18, 2019, https://freep.com/story/news/local/michigan/oakland/2019/07/18/birmingham-michigan-bond-sale-city-commission-meeting/1761393001.

speakers would be able to complete their two minute speaking time as long as they are not a disturbance to the meeting, but that those "who choose to advocate at this time may cause the broadcasting of the meeting to be paused." Following the open comment period, Defendant Currier further indicated that the policy now going forward is that they "will not turn off any broadcast unless people get directly into advocacy."

Defendants Bordman and Currier further asserted that their need to exclude political speech from the cable broadcast of City Commission meetings stemmed from the Michigan Campaign Finance Act's ("MCFA") provision prohibiting the use of public resources for ballot-related communications; thus discernibly referring to MICH. COMP. LAWS § 169.257(3).

Michigan's Secretary of State was permanently enjoined from enforcing that subsection three years ago by *Taylor v. Johnson*, No. 5:16-cv-10256 (E.D. Mich. April 28, 2016). Further, the content of regular televised broadcast of Birmingham City Commission meetings was never subject to that section even prior to the injunction due to the statute's exemption for "the production or dissemination of debates, interviews, commentary, or information by a broadcasting station, . . . in the regular course of broadcasting or publication."[2]

---

[2] MICH. COMP. LAWS § 169.257(1)(c).

5

It is not fully clear whether Defendants currently construe political advocacy speech to be limited to the subject of election candidates or ballot issues, as Defendant Currier referred to it at the July 22 meeting both in terms of support for particular candidates or ballot issues and in terms of "advocating for [one's] political position." Neither Plaintiffs Bloom nor Baller had referred to any candidate or ballot issue when Defendants Bordman and Currier deemed them to have run afoul of such a political speech restriction during the City Commission meeting on July 08.

On July 23, 2019, Plaintiff Baller received a response from the Birmingham City Clerk to his state Freedom of Information Act request for copies of all contracts existing between the city of Birmingham and BACB or other municipal cable boards. The response contains the city's interlocal agreement establishing the BACB, along with BACB's cable access management agreement with Bloomfield Community Television and appended policies and procedures.

Apart from prohibiting "advertising by or on behalf of a candidate for public office," as listed among other commercial advertising-related restrictions, none of such contractual agreements nor policies contains any provision barring the broadcast of political speech or advocacy, as purported by Defendants. To the contrary, the policies and procedures appended to BACB's management agreement

6

provide that Birmingham residents "may use the channel as a forum for free speech and express a diversity of viewpoints as outlined in the 1984 Federal Cable Act."[3]

## STANDARD OF REVIEW

In ruling on a motion for preliminary injunctive relief, a court must consider four factors: (1) the plaintiffs' likelihood of success on the merits; (2) irreparable harm to plaintiffs absent injunctive relief; (3) substantial harm to others resulting from an injunction; and (4) the broader public interest. *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 803 (6th Cir. 2017).

The factors to be weighed before issuing a temporary restraining order are the same as those considered for issuing a preliminary injunction. *Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 807 (E.D. Mich. 2012). "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 424 (6th Cir. 2014).

## ARGUMENT

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

In evaluating whether Defendants' restrictions on public comment speakers' political expression contravene the First Amendment's freedom of speech clause, the Court must apply a three-step inquiry to determine: (1) whether the speech at

---

[3] Bloomfield Community Television, Access Policies and Procedures § 3.3.

7

issue is constitutionally protected; (2) the nature of the forum; and (3) whether the government's action in shutting off speech is legitimate under the applicable standard of review. *Bible Believers v. Wayne County*, 805 F.3d 228, 242 (6th Cir. 2015) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

### A. The Speech at Issue is Core First Amendment Protected Expression.

By the very terms of Defendants' classification targeting political speech, the class of speech subjected to restriction is precisely that occupying "the highest, most protected position" in First Amendment jurisprudence. *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 660-61 (6th Cir. 2007); *see New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (observing that the First Amendment secures the "opportunity for free political discussion to the end that government may be responsive to the will of the people" and that "this opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion.'").

Even in so far as Defendants may now intend to narrow the scope of their restriction to advocacy relating to election candidates or ballot issues, such a particular variety of core political speech is "no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation." *Buckley v. Valeo*, 424 U.S. 1, 48 (1976); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("That this

8

advocacy occurred in the heat of a controversial referendum vote only strengthens the protection afforded"). "Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *Id*.

### B. The Venue and Broadcast of Birmingham City Commission Meetings Comprise a Designated and/or Limited Public Forum.

The Supreme Court has recognized three categories of public fora: the traditional public forum, the designated public forum, and the limited public forum. *Miller v. Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). The category of forum determines the applicable constitutional standard for reviewing restrictions on expressive activity. *Id*.

Traditional public fora, such as streets, sidewalks, and parks, are public places that have immemorially been provided for use by the public for assembly and discussion of public questions. *Walker v. Sons of Confederate Veterans*, 576 U.S. __, 135 S. Ct. 2239, 2250 (2015). Restrictions excluding speech within a traditional public forum must be necessary to serve a compelling state interest and narrowly drawn to achieve that interest. *Miller*, 622 F.3d at 534.

A designated public forum exists where government property that has not been traditionally regarded as a public forum is opened up for that purpose. *Walker*, 135 S. Ct. at 2250. Government restrictions on speech in a designated public forum "are subject to the same strict scrutiny as restrictions in a traditional public forum."

9

*Miller*, 622 F.3d at 534. Finally, the government may open up a limited public forum which may be reserved for certain speakers or discussion of certain subjects. *Kinkaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001). "Although the government need not retain the open nature of a limited public forum, 'as long as it does so it is bound by the same standards as apply in a traditional public forum.'" *Id*. (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

Although decisions of this Circuit have not taken a uniform approach to distinguishing designated and limited public fora, the contours of either such type of forum, lacking derivation from the underlying property's traditional function, are ultimately bottomed on the state's obligation to "respect the lawful boundaries it has itself set" for delimiting expressive activity. *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Whether the Birmingham City Commission's meetings may, as a whole, best be characterized as a designated public forum or a limited one, the open-comment session of each meeting, wherein the meeting is "opened to the public for their comments on non-agenda items," renders the "meeting [] a forum 'opened for use by the public as a place for expressive activity' at the time" of that session's occurrence. *Kirkland v. Luken*, 536 F. Supp. 2d 857, 874 (S.D. Ohio 2008).

Accordingly, such open-comment sessions of each meeting are bound by the same standards applicable to traditional public fora. *Kinkaid*, 236 F.3d at 348.

In further permitting public-comment during the other sessions of each meeting, but limiting the subject-matter to the agenda item under review, the Birmingham City Commission has, at a minimum, established a limited public forum during the sessions of each meeting dedicated to specified agenda items. Consequently, any restrictions on speech during those periods must be content-neutral and narrowly tailored to serve a significant governmental interest. *Ritchie v. Coldwater Cmty. Sch.*, 947 F. Supp. 2d 791, 807-08 (W.D. Mich. 2013); *see Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, No. 1:12-cv-355 at *17 (S.D. Ohio Jan. 11, 2013).

## 1.  The public forum extends to the cable broadcast.

As the Supreme Court has observed, "[F]orum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker." *Cornelius*, 473 U.S. at 801.

Although public forum analysis has traditionally applied to tangible property, the Supreme Court has long extended the "same principles [to] apply to government fora which are 'metaphysical,' as opposed to 'spatial or geographic.'" *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 842 (6th Cir. 2000) (applying public forum analysis to a city Web site) (quoting *Rosenberger*, 515 U.S. at 830); *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) (applying forum analysis

11

to televised candidates' debate without distinction between the venue and broadcast). Thus, "when the Government has intentionally designated a place *or means of communication* as a public forum, speakers cannot be excluded without a compelling governmental interest." *Cornelius*, 473 U.S. at 800 (emphasis added).

Because Defendants' choice to broadcast the full proceedings of City Commission meetings to the community fundamentally shapes the nature of the communicative platform and intended audience, the cable broadcast of such meetings is both itself a public forum and an integral element of the forum existing within the meeting venue. Accordingly, any content-based exclusion of particular public comments or speakers from the broadcast must be narrowly tailored to serve a compelling a state interest.

## C. No Compelling or Legitimate Interest Supports Defendants' Censorship of Citizens' Political Speech at City Commission Meetings.

Where a challenged speech regulation is "a content-based restriction on political speech in a public forum, [it] must be subjected to the most exacting scrutiny." *Boos v. Barry*, 485 U.S. 312, 322 (1988). Such is precisely the character of the regulation at issue here.

Although Defendants have framed their speech restriction as being applicable to any citizens advocating their political position, the "First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Burson v.*

12

*Freeman*, 504 U.S. 191, 197 (1992) (finding "facially content-based" a polling-place regulation whereby individuals' ability to exercise free-speech rights "depends entirely on whether their speech is related to a political campaign."); *accord Boos*, 485 U.S. at 319; *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537 (1980); *see Reed v. Town of Gilbert*, 576 U.S. __, 135 S. Ct. 2218, 2227 (2015) (a regulation is facially content-based and subject to strict scrutiny if it "applies to particular speech because of the topic discussed or the idea or message expressed").

Here, by specifically restricting the expression of public comment participants who choose to advocate political positions within the context of a public forum, Defendants have established a quintessentially content-based restriction which nothing short of a compelling state interest could sustain. Nor could even a hypothetically compelling state interest in suppressing core civic expression likely be cognizable under a framework of popular self-government.

Defendants have fully predicated their restriction of citizens' political speech upon the claim that preventing such speech from being transmitted through the cable broadcast of Commission meetings is compelled by the city's contractual agreement with the Birmingham Area Cable Board and by the MCFA. Because the city's contractual agreement contains no such provision, and the pertinent MCFA provision is both inapplicable and permanently voided by this Court, Defendants'

13

purported justification is entirely false. Having no underlying factual validity, such an interest can neither be compelling nor legitimate.

Even if such an alleged contractual provision did exist, it would itself be null and void as to any unconstitutional conduct required in its performance. *See Shelley v. Kraemer*, 334 U.S. 1, 20 (1948) (noting that when contractual enforcement conflicts with the Fourteenth Amendment, "it is the obligation of this Court to enforce the constitutional commands."). Because the city cannot be bound by constitutionally void agreements nor rely upon such instruments to legitimate constitutional infringements, Defendants can assert no valid interest in restricting public comment speakers' political speech upon the basis of a real or imagined contractual obligation.

1. **Excluding speakers engaged in political advocacy from the cable broadcast will severely limit expression.**

Even in so far as Defendants may now intend to limit the penalty imposed on political speech to pausing the cable broadcast of the offending speakers' comments, such a penalty will drastically impair such a speaker's ability to reach the substantial majority of his or her intended audience. *See Nader v. Blackwell*, 545 F.3d 459, 472 (6th Cir. 2008) (observing that state action limiting the size of a speaker's audience and amount of speech about his/her views that s/he can generate is a First Amendment injury). Indeed, it is in all substantive respects analogous to a policy, within a larger meeting hall, whereby certain public

14

comment speakers will have their microphones shut off so that only those seated in the front rows can hear them.

In light of the drastic reduction in audience size and exclusion from having one's views reflected in the video archive of such proceedings, it follows inevitably that speakers will be greatly chilled from speaking freely at the meetings themselves, lest they risk becoming excluded from the wider broadcast if found to be engaging in advocacy.

## 2. Defendants' policy of restricting political speech is void for vagueness.

As this Court has repeatedly observed, the First Amendment ensures that "speakers are protected from arbitrary and discriminatory enforcement of vague standards. The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement." *King Enter. v. Thomas Twp*., 215 F. Supp. 2d 891, 917 (E.D. Mich. 2002) (internal quotation marks omitted); *see Boddie v. Am. Broad. Co*., 881 F.2d 267, 270 (6th Cir. 1989) (noting that "the "general test of vagueness applies with particular force in review of laws dealing with speech," for which "a more stringent vagueness test should apply.").

Accordingly, a "statute that fails to constrain 'an official's decision to limit speech' with 'objective criteria' is unconstitutionally vague." *Miller*, 622 F.3d at 540.

15

> We will not presume that the public official responsible for administering a legislative policy will act in good faith and respect a speaker's First Amendment rights; rather, the vagueness doctrine requires that the limits the government claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice.

*United Food & Commercial Workers Union ("UFCW") v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998) (internal quotation marks and brackets omitted).

Here, Defendants have no officially written, much less objective, articulation of the criteria for determining that public comments amount to prohibited political advocacy; thus leaving public comment participants no guidance beyond the vague and inconsistent actions and spoken declarations of Defendants Bordman and Currier. Even at the present time, it remains unclear whether the act of "advocating [one's] political position," resulting in restriction, encompasses positions on *any* political issue or only election-related ones.

In further light of the facts that Defendants have thus far directed this restriction exclusively against expression critical of the NOW project proposal, while attributing its necessity to a non-existent contractual restriction never previously referenced, there is abundant indication that the risk of arbitrary and discriminatory enforcement of such a vague and unclear policy has manifested in practice.

Accordingly, because Defendants have failed to establish written or objective criteria for determining what speech is subject to restriction, while leaving

16

Defendants Bordman and Currier with unbridled discretion to modify and apply the policy at will, Defendants' policy restricting political speech is invalid under the First Amendment void for vagueness doctrine.

### 3. Defendants' policy of restricting political speech is overbroad.

A governmental regulation is overbroad if there is a realistic danger that it will significantly compromise recognized First Amendment protections of other persons not before the Court. *UFCW*, 163 F.3d at 361. The doctrine is aimed at preventing the challenged regulation from chilling or deterring future speech protected under the First Amendment. *Id*.

To the extent that Defendants' policy abstractly reflects the MCFA's concern over local governments using public resources to promote their own voting preferences in elections, any conceivably legitimate sweep of such a policy would be directed at limiting the Commission's own engagement in political advocacy speech or in unduly privileging the comments of those sharing their views. Yet, as applied, Defendants have instead directed this policy at opponents of their own preferred positions, who, in the course of directly criticizing the Commission, are least susceptible to being misinterpreted as speaking on the local government's behalf.

As noted above, even the threat of cutting off speakers' access to the cable broadcast is certain to chill public commenters from freely expressing their views

17

both in the meeting facility itself and in the cable broadcast. So too will an

inevitable chilling effect result from the ambiguity over whether particular speech

will trigger restriction. And quite predictably, those eager to minimize the risk of

crossing such a line will exercise particular care to limit voicing critical or

provocative perceptions with greater liability to be deemed advocative than those

aligning with the status quo.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF DEFENDANTS ARE NOT IMMEDIATELY ENJOINED FROM ENFORCING THE POLICY OF RESTRICTING POLITICAL SPEECH.

"[W]hen reviewing a motion for a preliminary injunction, if it is found that a

constitutional right is being threatened or impaired, a finding of irreparable injury

is mandated." *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003).

"'The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury.'" *Bays v. City of Fairborn*, 668 F.3d

814, 825 (6th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As

demonstrated above, Defendants' policy of restricting political speech severely

infringes the First Amendment rights of Plaintiffs and other persons similarly

situated. Therefore, the irreparable harm factor weighs in Plaintiffs' favor.

## III. NO HARM TO OTHERS IS APPLICABLE.

"[I]f the plaintiff shows a substantial likelihood that the challenged law is un-

constitutional, no substantial harm to others can be said to inhere its enjoinment."

*Id.*  Here, because Plaintiffs have shown a likelihood of success on the merits of their claim asserting constitutional violation by Defendants, no harm to Defendants or others can justify withholding relief.  Moreover, whereas Defendants have no legitimate interest in such a restriction's continued application, they will suffer no cognizable injury arising from its injunction.

## IV.  GRANTING IMMEDIATE INJUNCTIVE RELIEF WILL ADVANCE THE PUBLIC INTEREST.

The final factor is whether the public interest will be served by an injunction. Again, Plaintiffs' likelihood of success on the merits subsumes this factor because "it is always in the public interest to prevent violation of a party's constitutional rights." *Id.*

## V.  NO SECURITY BOND IS NECESSARY.

"It is well-established under Sixth Circuit case law that 'the district court possesses discretion over whether to require the posting of security.'" *Plainfield Specialty Holds II Inc. v. Children's Legal Services PLLC*, 634 F. Supp. 2d 833, 848 (E.D. Mich. 2009) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). Plaintiffs submit that requiring a bond would discourage public interest litigation such as the instant case, and would serve no practical purpose, since the preliminary injunction at issue will not subject Defendants to any risk of financial harm.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court grant a temporary restraining order and/or preliminary injunction barring Defendants from restricting political speech or advocacy by public comment speakers at Birmingham City Commission meetings upon the basis of its content or excluding public comments involving political speech or advocacy from the cable broadcast of City Commission meetings.

Respectfully submitted,

*s/Matthew S. Erard*
Matthew S. Erard (P81091)
Law Office of
Matthew S. Erard, PLLC
Counsel for Plaintiffs
400 Bagley St. #939
Detroit, MI 48226
(248) 765-1605
mserard@gmail.com

Dated: August 4, 2019

## CERTIFICATE OF SERVICE

I certify that, on August 4, 2019, I served the above document on the Defendants by mailing it to the Birmingham City Attorney and individual parties at their last known business addresses.

*s/Matthew S. Erard*
Matthew S. Erard

20